Filed 3/29/24

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>GABRIELA T. RANGEL AYALA et. al.,<br><br>      Defendants and Appellants. | D082754<br><br>(Super. Ct. No. RIF1605051) |

APPEALS from judgments of the Superior Court of Riverside County, Diane B. Altamirano** and John D. Molloy, Judges. Reversed and remanded.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant Gabriela T. Rangel Ayala.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant Raymundo Ortega Ramirez.

---

*      Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts B through E of the Discussion.
** Retired Judge of the Imperial Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Gabriela T. Rangel Ayala[1] and Raymundo Ortega Ramirez (together defendants) of murdering Samuel G. (Pen. Code,[2] § 187, subd. (a)), also finding true the special circumstance allegations that defendants killed Samuel while lying in wait (§ 190.2, subd. (a)(15)) and that the murder involved the infliction of torture (*id.* at subd. (a)(18)). The trial court sentenced Ayala to prison for life without the possibility of parole, and Ramirez to prison for life without the possibility of parole, plus 10 years.

The key witness for the prosecution was Breanna S., but she did not testify at trial. Instead, the jury heard only a reading of her testimony from the preliminary hearing years earlier. Defendants collectively maintain the court violated their right to confrontation by admitting this testimony. They claim the prosecution failed to demonstrate it exercised reasonable diligence in securing her attendance at trial. (Evid. Code, § 240, subd. (a)(5).) The People knew Breanna was an important witness who had gone missing at least two years before trial. Yet they waited until two weeks before the trial date to start their unsuccessful search for her. Under these circumstances, we conclude the prosecution failed to demonstrate reasonable

---

[1]     Although the trial minute orders, the abstract of judgment and the notice of appeal identify defendant as "Gabriela T. Rangelayala," we determine by the reporter's transcript that her name is "Gabriela Rangel Ayala" and refer to her as "Ayala" throughout the opinion.

[2]     Undesignated statutory references are to the Penal Code.

diligence in securing Breanna's presence at trial in accordance with Evidence Code section 240, subdivision (a)(5) and, as a result, the court erred by admitting her preliminary hearing testimony pursuant to Evidence Code section 1291.

We find it necessary to discuss some, but not all, of defendants' remaining arguments. First, we conclude the evidence is sufficient to permit retrial of Ramirez's first degree murder conviction and the lying in wait and torture special circumstances. Next, for the benefit of the trial court, we address two issues that may arise again on remand. We agree with Ayala's contention the trial court erred by allowing the prosecution to introduce evidence of her "Satan worshiping." But we reject defendants' argument the court erred when it declined to instruct the jury that Breanna was an accomplice as a matter of law.

Accordingly, we reverse the judgments and remand the matter to the trial court.[3]

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Participants*

In 2016, Ayala was living in an R.V. that was parked near an abandoned house in a remote area of Riverside County. The abandoned house had no electricity or running water. Ayala had two sons, Jonathan and Victor.[4] Cheyenne was Victor's girlfriend. In 2009, Ayala informally adopted Angel A. and considered him to be her son.

---

[3] This conclusion moots defendants' remaining arguments alleging instructional error, numerous instances of prosecutorial error, and cumulative error.

[4] Victor plays no significant role in these events because police arrested him on unknown charges before the murder occurred.

In August 2016, Breanna was about six months pregnant. At about this time, she met Samuel, the eventual victim, on an internet dating site. They met in-person about three times and twice engaged in a sexual relationship. After Breanna told Samuel that she no longer wanted to see him, he threatened to kill her and tell the father of her child, who was in prison, about their affair.

In September 2016, knowing that Breanna was homeless, Cheyenne and another person arranged for Breanna to meet Ayala so she could have a place to stay. They first met about three days before Samuel's murder. Ayala let Breanna sleep on a couch inside the R.V. Breanna, who viewed Ayala as a protector and mother-figure, mentioned that Samuel had been threatening her.

That same day, Ayala met Ramirez. Ramirez also started sleeping inside the R.V. Ayala referred to Ramirez as her "boyfriend" and Ramirez said Ayala was his "girl."

### Samuel's Murder

On the evening of September 11, Breanna was inside the R.V. with Ayala when she started getting calls from Samuel, which she ignored.[5] Breanna told Ayala that Samuel had threatened her, she feared him and was frustrated by his constant telephone calls. According to Breanna, Samuel wanted to continue having sex but she was no longer interested. Ayala asked for Breanna's phone to call Samuel. She called and asked him what he wanted with "her daughter." Ayala then started talking in a sexy voice about

---

[5]     Breanna testified under a grant of immunity. She was deemed unavailable at the time of trial and her preliminary hearing testimony was read to the jury.

Samuel coming to the property for a threesome. Breanna could not hear Samuel's responses.

After the call, Ayala appeared angry because she found it inappropriate for Samuel to be interested in a threesome after she identified herself as Breanna's mother. Breanna told Ayala that she did not want to see Samuel and was not interested in a threesome. Ayala responded that Samuel would "get his threesome" and pounded her fist.

Breanna said she thought Ayala was going to beat up Samuel or scare him so he would leave her alone. She heard Ayala giving Samuel directions to the R.V. and saw that she also sent him a text message. After this occurred, Ayala did not return Breanna's phone. Breanna heard Ayala pray, " 'Dear Lord Satan, please let this go through.' " Ramirez then went inside the R.V. Breanna decided to leave and went into the abandoned house. Watching from a window in the house, Breanna saw the headlights of Samuel's car. She saw Samuel get out of the car, talk briefly with Ayala, and then go with her into the R.V.

A few minutes later, Breanna heard what she characterized as the screams "of someone dying" from inside the R.V. It was a male voice. Shortly after the screaming started, Breanna heard Ayala yell for Angel. After the screaming stopped, Ayala called her name. When Breanna approached the R.V., she saw Ramirez and Angel pull Samuel out of the R.V. on a sheet. Samuel's head was smashed in and it appeared to Breanna that he was dead. Breanna heard Ayala tell Ramirez and Angel to bring Samuel's body to the fire pit. They put the body in the fire along with Samuel's phone and wallet.

Angel, Ramirez and Ayala burned their clothes, washed their bodies, and put on different clothes. Ayala then instructed Breanna to help clean up the blood and the mess inside the R.V. Breanna did whatever Ayala told her

5

to do because she remembered what Cheyenne had said about Ayala's violent tendencies and she was afraid. Ayala called Jonathan, told him something bad had happened and they needed to get rid of a car. Jonathan eventually sold Samuel's car for methamphetamine and about $40 cash.

## DISCUSSION

**A.** ***There Was Prejudicial Error in Admitting Breanna's Preliminary Hearing Testimony***

It took an investigator with the district attorney's office two months to locate Breanna for the 2017 preliminary hearing. On November 30 and December 4, 2017, Breanna appeared and testified. After that hearing and sometime "pre-COVID," the district attorney's office lost contact with her. There was no record of any contact after the preliminary hearing.

Trial was originally scheduled for May 11, 2018. After multiple stipulated or unopposed continuances, trial was set for April 8, 2020. However, on March 23, 2020, the Chief Justice of California issued a statewide order suspending jury trials for sixty days because of the COVID-19 pandemic.[6] There were numerous additional continuances, some based on new emergency orders. On June 15, 2021, trial was trailed to July 13. On that date, all parties announced they were ready for trial.

Jury selection began on July 19, 2021. That same day, the People filed their witness list, which included Breanna's name, and moved in limine to introduce Breanna's preliminary hearing testimony on the ground she was unavailable pursuant to Evidence Code section 1291. The court tentatively

---

[6]    (<Https://newsroom.courts.ca.gov/covid-19-news-center/court-emergency-orders> [as of March 29, 2024], archived at <https://perma.cc/7DFQ-KXZU>.)

6

ruled that Brenna's preliminary hearing testimony could be read to the jury, subject to a due diligence hearing.

When the prosecution case began on July 22, 2021, district attorney investigator Felipe Villalobos testified at the due diligence hearing regarding efforts undertaken by the People to locate and serve Breanna. Villalobos explained that he created a subpoena for Breanna on July 6, 2021, less than two weeks before the start of trial. Using several programs, he located two addresses for her in Los Angeles. He went to both locations and learned that Breanna's child lived at one of them with the paternal grandmother.

On July 7, he visited the paternal grandmother's residence, which was also the address on Breanna's driver license, and discovered that Breanna had been there sometime before July 4 to visit her child. The paternal grandmother reported that Breanna was homeless, would be gone for a month or two, and "comes and goes like the wind." Villalobos obtained two telephone numbers for Breanna and one for Breanna's friend. Two of the numbers were disconnected, and he left a voice mail and text message on the other.

Villalobos had the Los Angeles police run Breanna's name through their computer system but did not locate her. He created a wanted flyer for Breanna which was distributed to over 400 officers. He also communicated with the sheriff's department and had an alert placed on Breanna's name to notify him if anyone had contact with her. On July 21, Villalobos again visited the two Los Angeles addresses, and followed up on another address and telephone number for her, without success. He visited two markets in Los Angeles where Breanna had used her "Cal Fresh card," but no one at the markets recognized her photograph. He also checked to determine if Breanna was in custody.

After hearing argument, the court found the People made a good faith effort and exercised reasonable diligence to obtain Breanna's appearance at trial. It subsequently allowed Breanna's preliminary hearing testimony be read to the jury.

Defendants assert the trial court erred in admitting Breanna's preliminary hearing testimony because the prosecutor failed to prove due diligence in attempting to secure her presence at trial. In particular, they fault the prosecution's delay in beginning the search for Breanna after losing touch with her following the preliminary hearing. The People disagree with defendants' contentions. They also argue that even if the court erred by admitting the preliminary hearing transcript, the error was harmless beyond a reasonable doubt because Breanna's account of what occurred that night was mostly duplicative of Angel's statements to the police and corroborated by the physical evidence found at the scene.

A criminal defendant has a constitutional right to confront prosecution witnesses, but the right is not absolute. (*People v. Cromer* (2001) 24 Cal.4th 889, 892 (*Cromer*).) "An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination." (*Ibid.*) Under this exception, the preliminary hearing testimony of an unavailable witness may be admitted at trial without violating a defendant's confrontation right. (*People v. Herrera* (2010) 49 Cal.4th 613, 621 (*Herrera*).)[7] A witness is

_____

[7] This exception is codified in Evidence Code section 1291, subdivision (a)(2), which provides that "former testimony," such as preliminary hearing testimony, is not made inadmissible by the hearsay rule if "the declarant is unavailable as a witness," and "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the

unavailable when the witness is absent from the hearing and the proponent of the witness's testimony has exercised reasonable diligence but has been unable to procure the witness's attendance by the court's process. (Evid. Code, § 240, subd. (a)(5).)

Factors we consider in determining whether the prosecutor has shown reasonable diligence include the timeliness of the search, the importance of the witness's testimony, and whether leads to the witness's possible location were reasonably explored. (*People v. Thomas* (2011) 51 Cal.4th 449, 500 (*Thomas*).) The timely commencement of the search and the energy with which it was pursued are sequential aspects of the prosecution's obligation to demonstrate diligence. But whether these efforts were reasonable depends in part on the importance of the witness's testimony. If a witness is critical, the search must be started sooner and pursued with more energy than if the witness is less significant. And while we defer to the trial court's determination " 'of the historical facts of what the prosecution did to locate an absent witness' " (*id.* at p. 503), we independently review the prosecution's claim of good faith and reasonable diligence.

Defendants do not dispute that they were parties to the action in which Breanna's former testimony was given, and they exercised their right to cross-examine her with the requisite interest and motive. The question is whether Breanna was unavailable as a witness. On this issue, we analyze the timeliness of the search, the importance of Breanna's testimony, and the extent to which the prosecution diligently investigated any available leads. (*Thomas, supra*, 51 Cal.4th at p. 500.) Defendants did not identify any

---

declarant with an interest and motive similar to that which he has at the hearing."

9

promising leads that Villalobos failed to investigate. Rather, they focus on the timeliness of the search and the importance of Breanna's testimony.

Ayala contends this case is like *Cromer, supra*, 24 Cal.4th 889, where the prosecution knew the witness had moved in June 1997 but took no action to locate her until December 1997 for a January 12, 1998, trial date. (*Id.* at p. 903.) Then, investigators merely visited the witness's former residence only to be informed that the witness no longer lived there. (*Ibid.*) When investigators learned she was living in another location with her mother, they waited two days to follow up on this information. (*Id.* at pp. 903–904.) Although an investigator eventually left a subpoena at the home where the witness's mother resided, the investigator failed to return to the home or attempt to find contact information so they could speak with the mother. (*Id.* sat p. 904.)

Our case is similar in certain key respects. Breanna appeared and testified at the preliminary hearing in late 2017. The district attorney's office then lost contact with her sometime "pre-COVID." After several continuances, trial was set for April 8, 2020. There is nothing in the record showing the prosecution did anything to locate Breanna before this trial date. Based on the COVID-19 pandemic and the suspension of jury trials in March 2020 it is likely the prosecution simply believed the matter would not go to trial in April 2020 and it need not locate her. But it was also aware that the matter would eventually be rescheduled for trial, and that Breanna, an important witness, was missing. Nonetheless, the prosecution did nothing to locate her.

There were numerous additional continuances. On June 15, 2021, trial was trailed until July 13, and on the latter date, the parties finally announced they were ready for trial. Yet it was not until July 6, seven days

10

earlier, that Villalobos first created a subpoena for Breanna and the search for the missing witness began. Villalobos quickly learned that Breanna's child lived with the paternal grandmother, visited that location the following day and discovered Breanna had been there sometime before July 4 to visit her child. Critically, had the prosecution attempted to locate Breanna a few weeks or even days earlier it would have discovered where her child lived, that Breanna visited her child every month or two, and likely could have contacted her well before the eventual trial date.

Breanna lived a transient lifestyle, but she cooperated with police before the preliminary hearing by telephoning the investigator when she learned law enforcement was looking for her. The investigator met with Breanna, who identified photographs of Ayala and Ramirez as being involved in the murder. She also participated in a walk-through of the crime scene and pointed out the firepit where Samuel's body had been burned. The investigator then interviewed Breanna a second time. The following year, Breanna appeared at the preliminary hearing. There is nothing in the record to suggest that Breanna disappeared to avoid testifying, would have been uncooperative if located or even knew the prosecution was looking for her.

Although the prosecution exercised diligence during the two weeks it searched for Breanna immediately before trial,[8] it did nothing to locate her during the months this matter was repeatedly continued for trial, making the search untimely. The uncertainty as to when trial would begin does not excuse the prosecution from timely starting to search for a cooperative

---

[8]     Villalobos checked to see if Breanna was in custody, had the Los Angeles police run her name through their computer system, distributed wanted flyers, had the sheriff's department place an alert on Breanna's name, called three telephone numbers, and checked markets where Breanna had previously shopped.

witness it actually knew was missing. The record suggests Breanna would have been found and produced had the prosecution begun to look for her even a short time earlier.

We next analyze the importance of Breanna's testimony, which bears heavily on whether the prosecution's unexplained delay in commencing the search for Breanna satisfies the constitutional requirement for reasonable diligence. In *People v. Louis* (1986) 42 Cal.3d 969, 991–995 (*Louis*)[9] the most critical evidence for the prosecution's case was the prior testimony of an absent witness. (*Id.* at p. 989.) As the court observed, "the sole evidence identifying defendant as the trigger man came from [the absent witness]." (*Ibid.*) In reaching the conclusion that the prosecution did not exercise due diligence, the Supreme Court reasoned that the expectation of diligence is particularly high when the witness's testimony is critical for the conviction. (*Id.* at p. 991.)

Like the witness in *Louis,* Breanna was essential to the prosecution's case. She was the only witness who knew Samual and had percipient knowledge of the events leading up the murder, including Ayala's alleged motive for the murder. The only other evidence on these matters came from Ayala whose testimony about the events leading to the murder materially differed from Breanna's.[10] As we address below, Breanna's testimony was

---

[9]    *Louis, supra*, 42 Cal.3d 969 overruled on another ground in *People v. Mickey* (1991) 54 Cal.3d 612, 672, fn. 9.

[10]    Ayala testified that Breanna gave Samuel the address over the phone and texted the information to him. Breanna then guided Samuel to the property over the phone and with a flashlight, where he met Ayala, Ramirez and Breanna outside the R.V. According to Ayala, she never spoke to Samuel on the phone. After all four sat down to eat, Samuel allegedly said "Let's do this." When Samuel clarified he wanted a "threesome," Ayala slapped him stating she was old enough to be his mother. Samuel pushed her down to her

12

critical to establish the degree of murder and the lying in wait special circumstance allegation as to both defendants. (See, *post*, pt. B.) Her testimony was also needed to corroborate Angel's testimony regarding the torture special circumstance allegations. Consistent with *Cromer*, *supra*, 24 Cal.4th 889, we conclude Breanna was not an unavailable witness, and the court erred by admitting her preliminary hearing testimony pursuant to Evidence Code section 1291.

"When there is ' "a reasonable possibility" ' that the error might have contributed to the verdict, reversal is required." (*People v. Aranda* (2012) 55 Cal.4th 342, 367.) We conclude the error was not harmless beyond a reasonable doubt as to either defendant because Breanna's testimony was critical to several aspects of the prosecution's case. (*Chapman v. California* (1967) 386 U.S. 18, 24; *Lilly v. Virginia* (1999) 527 U.S. 116, 139–140 [applying *Chapman* beyond a reasonable doubt standard to violations of the Confrontation Clause].) Accordingly, we reverse defendants' first degree murder convictions and the attached special circumstance allegations.

## B.   *Ramirez's First-Degree Murder Charge and the Lying in Wait Special Circumstance Allegation May be Retried*

"[W]hen a defendant's conviction is reversed by an appellate court on the sole ground that the evidence was insufficient to sustain the jury's verdict, the Double Jeopardy Clause bars a retrial on the same charge." (*Lockhart v. Nelson* (1988) 488 U.S. 33, 39.) "It has long been settled, however, that the Double Jeopardy Clause's general prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through

---

seat. She then saw Samuel's and Ramirez's fists flying as she ran toward the door and Breanna ran to the other room.

direct appeal or collateral attack, because of some error in the proceedings leading to conviction." (*Id.* at p. 38.) Here, a retrial would generally be permissible because the trial court's erroneous admission of Breanna's preliminary hearing testimony is based on trial error. (*Burks v. United States* (1978) 437 U.S. 1, 15 [retrial permissible based on "incorrect receipt or rejection of evidence"].) However, Ramirez also contends he cannot be retried for first degree murder because the evidence of premeditation and special circumstances was insufficient as a matter of law. Accordingly, we are required to address the merits of his sufficiency contentions.

To determine the sufficiency of the evidence, "we review the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible and of solid value, from which a rational trier of fact could find that the elements of the crime were established beyond a reasonable doubt." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.) We must "view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Lewis* (1990) 50 Cal.3d 262, 277 (*Lewis*).) Reversal based on insufficient evidence is warranted only if "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  " '[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt . . . .' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055–1056.) The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction, unless that testimony is physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).) "A sufficiency of evidence challenge to a special circumstance finding is

reviewed under the same test applied to a conviction." (*People v. Stevens* (2007) 41 Cal.4th 182, 201 (*Stevens*).)  In reviewing the sufficiency of the evidence to determine whether retrial is permissible for purposes of double jeopardy, we "must consider *all* of the evidence presented at trial, including evidence that should not have been admitted." (*People v. Story* (2009) 45 Cal.4th 1282, 1296.)

The jury convicted Ramirez of first degree murder and found true the special circumstance allegation that he intentionally killed Samuel while lying in wait.  The court instructed the jury that Ramirez could be guilty as a direct perpetrator or by aiding and abetting the perpetrator.  (CALCRIM Nos. 400, 401.)  "Aiders and abettors may . . . be convicted of first degree premeditated murder based on direct aiding and abetting principles. [Citation.]  Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.  [Citation.]  Because the mental state component—consisting of intent and knowledge—extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder.  [Citation.]  An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent.  Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*People v. Chiu* (2014) 59 Cal.4th 155, 166–167, superseded by statute on another ground as stated in *Lewis, supra,* 11 Cal.5th at p. 959, fn. 3.)  The required elements for aiding and abetting are:  (1) the perpetrator's commission of the crime; (2)

15

knowledge of the perpetrator's unlawful purpose, (3) specific intent to aid that purpose, and (4) an act by the defendant which facilitates the commission of the crime. (See CALCRIM No. 401.)

The theories of first degree murder presented to the jury were killing "by means of . . . lying in wait" and "willful, deliberate, and premeditated killing." (§ 189, subd. (a).) Where, as here, a jury is instructed on two theories of first degree murder, a guilty verdict will be upheld if sufficient evidence supports either one of the theories. (*People v. Sandoval* (2015) 62 Cal.4th 394, 424 [sufficient evidence of premeditation and deliberation, thus no need to decide sufficiency of evidence of murder by means of lying in wait].) The lying in wait special circumstance requires (1) an intentional murder committed under circumstances that include (2) a concealment of purpose, (3) a substantial period of watching and waiting for an opportune time to strike, and (4) a surprise attack on an unsuspecting victim from an advantageous position. (*People v. Parker* (2022) 13 Cal.5th 1, 58 (*Parker*).) "The purpose of the watching and waiting element is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citation.] This period need not continue for any particular length " 'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." ' [Citation.] ' " 'The element of concealment is satisfied by a showing " 'that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim.' " ' " ' " (*Stevens, supra,* 41 Cal.4th at p. 202.) Sufficient evidence of each element was introduced at trial.

According to Breanna, Ayala lured Samuel to the property with the promise of a "threesome." When Breanna told Ayala she was not interested

16

in a threesome, Ayala responded that Samuel would "get his threesome" and pounded her fist. The jury could reasonably infer that the "threesome" Ayala referred to was her, Ramirez and Samuel. Ayala testified that on the evening of the murder she called Ramirez and asked him to come to her R.V. She admitted wanting Ramirez there before Samuel arrived and agreed she asked Ramirez to be there as a "protector." She also agreed with the prosecutor that the intended victim was physically too big for her and Breanna "to take Samuel out" by themselves. When Ramirez arrived at the R.V., Breanna saw Ayala speak to him and overheard Ayala asking for Ramirez's help. Ramirez then went inside the R.V. and Samuel arrived about five minutes later. Ramirez's act of secreting himself inside the R.V., instead of waiting outside with Ayala to meet Samuel and protect her, supports the inference defendants planned a surprise attack on Samuel from an advantageous position. (*Parker, supra*, 13 Cal.5th at p. 58.)

Breanna saw Samuel get out of his car, talk briefly with Ayala, and then go with her into the R.V. About three to five minutes after Samuel went inside the R.V., Breanna heard a man screaming in pain. Shortly after the screaming started, Breanna heard Ayala yell for Angel. When Angel stepped inside the R.V. he saw a man lying on the floor getting beat up by Ayala and Ramirez. He specifically observed Ramirez hitting Samuel in the head and torso. Ramirez helped Angel put Samuel's body in the fire, then burned his clothes, washed himself, and put on different clothes.

A jury could reasonably conclude this evidence supports the four elements of lying in wait and the inference that Ramirez had the opportunity to reflect on his intentions and did not act "out of rash impulse." (*Stevens, supra,* 41 Cal.4th at p. 202.) Ramirez's presence at the scene of the crime, his close companionship with Ayala, tossing Samuel into the fire, and his conduct

after the offense also support aiding and abetting liability. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409 [factors to consider in determining aiding and abetting include presence at the scene of the crime, companionship, and conduct before and after the offense].)

In sum, the totality of the evidence is sufficient for a reasonable jury to conclude Ramirez committed first degree murder or lying in wait, to allow retrial for the murder charge and special allegation against him.

## C.     *The Torture Murder Special Circumstance Allegation May be Retried*

"To prove a torture-murder special circumstance, the prosecution must show that defendant intended to kill and had a torturous intent, i.e., an intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose." (*People v. Streeter* (2012) 54 Cal.4th 205, 237; CALCRIM No. 733.)  The intent to torture " ' "is a state of mind which, unless established by the defendant's own statements (or by another witness's description of a defendant's behavior in committing the offenses), must be proved by the circumstances surrounding the commission of the offense [citations], which include the nature and severity of the victim's wounds." ' " (*People v. Tran* (2022) 13 Cal.5th 1169, 1202–1203.)  "[R]evenge, extortion, and persuasion are self-explanatory.  Sadistic purpose encompasses the common meaning, ' "the infliction of pain on another person for the purpose of experiencing pleasure." ' " (*People v. Massie* (2006) 142 Cal.App.4th 365, 371.)  The length of time over which the offense occurred and the severity of any wounds are relevant, but not necessarily determinative.  (*Ibid.*)

In cases that "have upheld [torture-murder special circumstance] findings, the evidence has shown that the defendant deliberately inflicted

18

nonfatal wounds or deliberately exposed the victim to prolonged suffering," thereby demonstrating a " ' "sadistic intent to cause the victim to suffer pain in addition to the pain of death." ' " (*People v. Mungia* (2008) 44 Cal.4th 1101, 1136, 1137.) "It is not the amount of pain inflicted which distinguishes a torturer from another murderer, as most killings involve significant pain. [Citation.] Rather, it is the state of mind of the torturer—the cold-blooded intent to inflict pain for person gain or satisfaction—which society condemns." (*People v. Steger* (1976) 16 Cal.3d 539, 546.)

Ramirez argues the record does not show he acted with the specific intent to cause extreme pain and suffering or that he wanted revenge, was trying to extort or persuade Samuel, or participated in the murder for any sadistic purpose.[11] Based on the evidence adduced at trial, the jury could infer beyond a reasonable doubt that Ramirez intended to cause extreme pain or suffering for a sadistic purpose.

Angel's pretrial interviews were admitted at trial and played for the jury. He told investigators that although it was dark inside the R.V., he could see Samuel on the floor trying to fight as Ramirez hit him. Angel saw a "big blunt object" in Ramirez's hand that appeared to be a box with handles and could have been a generator or a skill saw. Angel claimed Ayala was sitting while Ramirez hit Samuel's upper torso at least twice with the object. Angel stated that Samuel was aware of what was happening and "flail[ed]" as he "tr[ied] to get out."

_____

11    Ramirez also appears to argue that Angel's statements should not be considered because they were uncorroborated. However, independent corroboration is required only to prove the crime underlying the torture special circumstances allegation, not the special circumstances allegation itself. (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1177; *People v. Noguera* (1992) 4 Cal.4th 599, 632, fn. 9.)

When Ayala and Ramirez told him to move Samuel, Angel could hear Samuel "grasping for his life." Angel saw that Samuel's face was bashed in, part of his neck was missing, and Samuel was trying to breathe. Angel told investigators that Samuel was still alive when his body slid out of the R.V. because "you could see in his neck that he was still breathing." After Ramirez asked for Angel's help in dragging Samuel, each man grabbed one side of the body. Angel stated that when Samuel was placed in the fire he was alive because he saw Samuel's Adam's apple pulsing, then about ten minutes later he saw Samuel's eyes roll back and the pulsing stopped.

Although there is no direct evidence Ramirez knew Samuel was still alive when he and Angel place him in the fire, the jury could reasonably infer that Ramirez, who helped Angel drag Samuel to the fire, saw what Angel observed, namely, that Samuel was still alive but likely was dying from the severe wounds to his head and neck. Although Ramirez could have killed Samuel with another blow, he chose instead to place him into the fire where he arguably survived for about ten minutes. Although other inferences are possible, a rational jury could infer that by placing Samuel alive into the fire, Ramirez deliberately and intentionally caused Samuel extreme pain or prolonged suffering to satisfy a sadistic impulse or purpose. Because the focus "is on defendant's *intent* to inflict pain and suffering, . . . [i]t need not be demonstrated that the victim was actually conscious and suffered pain at the time otherwise painful injuries were inflicted." (*People v. Powell* (2018) 5 Cal.5th 921, 945.) Accordingly, we conclude the torture special circumstance allegation may be retried on remand.

### D. *The Court Erred in Admitting Evidence of "Satan Worshiping"*

During opening statements, the prosecutor told the jury that Ayala's "true religion is the worship of Satan." She claimed Ayala prayed to Satan to

20

let the murder go through and had a "satanistic plan" to kill Samuel. On the second day of trial, Ayala's defense counsel moved in limine to exclude any evidence of Ayala's Satan worshiping and praying to the devil on the ground this evidence was irrelevant, inadmissible uncharged bad acts evidence under Evidence Code section 1101, and more prejudicial than probative. The trial court denied the motion, finding this evidence would not unduly consume time, did not constitute uncharged bad acts evidence, and was relevant to Ayala's state of mind regarding the torture and lying in wait special circumstance allegations.

Thereafter, the jury heard three witnesses testify regarding Ayala's prayers to Satan. Her "adopted" son Angel was aware that Ayala prayed to Satan and referred to Satan as her father. Angel opined that Ayala believed in Satan. But on the night of the murder, he did not hear any prayers to Satan and did not remember hearing any other Satanic references. When asked on direct how Ayala's beliefs affected him, Angel claimed he did not find them important because he did not share her beliefs. During cross-examination, he testified that Ayala believed in the devil, the belief made her dangerous to other people, and if he was no longer under Ayala's protection she "would turn this stuff" on him.

On the day of the murder, Breanna heard Ayala say a prayer about Satan. She also previously heard Ayala use the word Satan when Ayala's son was "locked up." She observed "Satanic cards" inside the R.V. but never saw Ayala use the cards.

When asked about Ayala's religion, Jonathan testified that Ayala's religion was Satanic, "like witchcraft stuff," and that she worshiped "Santa Muerte," which he thought was like "the devil's advocate" and bad. During his childhood, Jonathan had heard Ayala praying for death to come upon

21

people, and throughout his life he heard her chanting, which he interpreted as praying to Satan. On cross-examination, Jonathan agreed he was "a little bit afraid" of Ayala, partly because of the Satanic business he talked about and partly because she had previously pulled a gun on him.

Ayala testified on direct that she worshiped Santa Muerte, "a God for drug dealers," not Satan or the devil. She explained that she used to sell drugs, and "Muerte" was one of her drug cartels or dealers that they worship for their drug deals to go through. Ayala agreed that her nickname "Ms. Diabla" meant "female devil," but said this was her stripper name when she danced at strip clubs. She denied praying to Santa Muerte or Satan before Samuel arrived and claimed Breanna and Angel were wrong. On cross-examination, Ayala contradicted herself. She agreed that she prayed to Santa Muerte for successful drug deals and that Santa Muerte was a type of religion pertaining to Satan and the devil. She explained that Santa Muerte was related to the grim reaper who represents death, murder and darkness. During closing argument, the prosecutor asserted that Ayala's prayers to Satan were part of a sadistic ritual and showed her intent to kill.

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, . . . having *any tendency* in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210, italics added.) Relevant evidence " 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent or motive.' " (*People v. Champion* (1995) 9 Cal.4th 879, 922.) Relevant evidence must be excluded "when its probative value is *substantially* outweighed by its prejudicial effect." (*People v. Tran* (2011) 51 Cal.4th 1040, 1047 (*Tran*); Evid. Code, § 352.) " 'Evidence is substantially more prejudicial than probative [citation] [only] if,

broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*Tran*, at p. 1047.)

We acknowledge that evidence of Ayala's Satanic beliefs carried with it the potential for creating unfair prejudice. As our Supreme Court has recognized, "[a] favorable view of the biblical figure of Satan is generally understood as a symbolic rejection of the values of love and compassion, and as indicating acceptance of the contrary values of hatred and violence, with a consequent rejection of all moral restrictions on crimes such as murder." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1135.) Accordingly, the issue here is whether the indisputably prejudicial effect of this evidence substantially outweighed its probative value. (*Tran, supra*, 51 Cal.4th at p. 1047.)

We find the evidence had minimal probative value. It may have had some relevance in showing Ayala's intent to kill. After Breanna heard Ayala giving Samuel directions and saw that a text message was sent, She heard Ayala pray, "Dear Lord Satan, please let this go through." If believed, the jury might infer from this evidence that Ayala prayed for Satan's help in murdering Samuel.

The People also argue the evidence of Satan worship was relevant to show the witnesses' fear of Ayala and why they may have complied with her demands. But the support for this assertion is slight. Cheyenne told Breanna that Ayala was "a cool person" but "not that great of a person." She warned that if Ayala got mad she would not be afraid to hit Breanna. She added that Breanna "cannot say anything about God" in Ayala's presence. Breanna claimed the "really big reason" why she did not contact the police after the murder is because she was "terrified of [Ayala]. She told me if I ever contacted the police, she has people to find me; she could find me wherever I go." When the police first contacted her, Breanna admitted lying

23

because she was terrified but decided to tell the truth after she realized what the police already knew. Breanna explained that after the killing, she followed Ayala's orders to help clean up the blood in the R.V. because she was terrified and "did whatever [Ayala] told me to do."

While this evidence tends to show that Breanna feared Ayala, nothing connected Breanna's fear to Satanic worship rather than a generalized fear of Ayala as a potentially violent person who should not be crossed. The only evidence from which an inference could be drawn that Breanna feared Ayala because of unorthodox spiritual beliefs was testimony from Breanna that she became "scared" when she heard Ayala praying to the devil about Victor. This testimony, however, was exceedingly brief and lacked any elaboration.

Evidence that Angel feared Ayala based on her religious practices is also weak. Angel repeatedly told investigators that he voluntarily participated in Samuel's murder. He testified he was not threatened by Ayala but feared her. Angel did not know that Ayala believed in the devil when she took him in, and by the time he found out about her beliefs he did not know how to extricate himself from the situation. One of the first things Angel did when getting into the police interview room is yelling twice " 'I love you, Mom' " because he had to be careful if he wanted to extract himself from Ayala. When Ayala told Angel to do things, he obeyed because he had a general fear about crossing her and believed she might shoot him. Although he was generally aware that Ayala prayed to Satan, believed in Satan, and referred to him as "her father," he did not hear her comment about Satan or say prayers to Satan on the night of the murder.

Like Breanna, this evidence shows Angel feared Ayala but fails to connect Angel's fear of Ayala to Satanic worship. Angel's comment that Ayala's belief in Satan made her physically dangerous to other people is the

24

only evidence from which the jury could infer that Angel may have feared Ayala based on her belief in Satan. But this testimony was also brief and lacked elaboration. Although Jonathan testified he was "a little afraid" of Ayala, partly because of her Satanic worship, counsel did not ask any follow-up questions connecting Jonathan's act of selling Samuel's car after the murder to his fear of Ayala based on her worshiping Satan.

Thus, evidence Ayala worshiped Satan at best had only minor probative value regarding her state of mind or intent, and to show that certain witnesses feared her. As we have already noted, the potential for unfair prejudice is patent. The trial court erred in admitting the evidence because of its limited probative value and high potential for prejudice. (Evid. Code, § 352.) On remand if the matter is retried, this evidence should be excluded.

## E. *Trial Court Did Not Err by Failing to Instruct That Breanna Was an Accomplice as a Matter of Law*

While discussing jury instructions, defense counsel asserted that, for purposes of jury instructions, Breanna could be construed an accomplice. The prosecutor disagreed, stating Breanna was never part of the murder plot and her receipt of immunity did not "trigger[ ] an accomplice act." Defense counsel argued the trial court should instruct with CALCRIM No. 335, to inform the jury that Breanna was an accomplice as a matter of law, because the prosecutor sought to admit Breanna's statements under the coconspirator exception and being a coconspirator is synonymous with being an accomplice.

Ramirez's counsel believed that when the parties discussed admitting Ayala's statements as those of a coconspirator, Breanna was included among the conspirators. The prosecutor disagreed that she presented Breanna's statements as a coconspirator to the events and argued the court should

25

instruct with CALCRIM No. 334, which would allow the jury to decide whether Breanna was an accomplice. The trial court did not find Breanna was an accomplice as a matter of law and concluded it would instruct the jury with CALCRIM No. 334.

Under CALCRIM No. 334, the jurors were told they had to decide if Breanna was an accomplice. They were instructed that an accomplice is "subject to prosecution for the identical crime charged against [defendants]." An accomplice had to personally commit the crime, or aid and abet its commission knowing the criminal purpose of the perpetrator. The jurors were advised that if they determined Breanna was an accomplice, they could not convict defendants based on her testimony alone. Instead, corroborating evidence was needed which tended to connect defendants to the commission of the charged crimes. If Breanna was an accomplice, the jurors were to view her testimony with caution.

Defendants contend the trial court erred when it denied their request to instruct the jury that Breanna was an accomplice as a matter of law under CALCRIM No. 335. The People disagree, claiming the trial court properly instructed the jury with CALCRIM No. 334 because Breanna's status as an accomplice was reasonably disputable. Even assuming the court erred by failing to instruct the jury that Breanna was an accomplice as a matter of law, the People assert the assumed error was harmless because Breanna's testimony was amply corroborated. We conclude the trial court properly instructed the jury with CALCRIM No. 334 instead of CALCRIM No. 335.

"Section 1111 defines an accomplice as 'one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' In order to be chargeable with the identical offense, the witness must be considered a principal under

26

section 31. That statute defines principals to include '[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . .' [Citations.] A mere accessory, however, is not liable to prosecution for the identical offense, and therefore is not an accomplice." (*People v. Horton* (1995) 11 Cal.4th 1068, 1113–1114 (*Horton*).)

"Whether someone is an accomplice is ordinarily a question of fact for the jury; only if there is no reasonable dispute as to the facts or the inferences to be drawn from the facts may a trial court instruct a jury that a witness is an accomplice as a matter of law." (*People v. Valdez* (2012) 55 Cal.4th 82, 145–146.) When the issue of whether a witness is an accomplice is disputed, "[t]he burden is on the defendant to prove by a preponderance of the evidence that a witness is an accomplice." (*People v. Fauber* (1992) 2 Cal.4th 792, 834.) We review a claim for instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Defendants first argue that Breanna could have been charged as a direct participant in the murder. The evidence, however, does not conclusively show that Breanna participated in the murder. According to Breanna, she was inside the abandoned house when she heard screams coming from the R.V. After Breanna heard Ayala call her name, she approached the R.V. and saw Ramirez and Angel pulling Samuel out of the R.V. on a sheet. In contrast, Ayala claimed Breanna was inside the R.V. when Ramirez and Samuel began to fight. Although Breanna did not come outside with her, Ayala assumed Breanna went to the back of the R.V. Angel told police that Breanna was sitting on a bed in the bedroom of the R.V. when

27

he observed Ayala and Ramirez hitting Samuel. No witness testified that Breanna participated in beating Samuel.

Defendants next argue Breanna was a direct aider and abettor to the murder: that is, a person who "with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aid[ed], promote[d], encourage[d] or instigate[d], the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) While the evidence shows Breanna's phone was used to lure Samuel to the campsite, the evidence is disputed whether Breanna or Ayala spoke to Samuel and directed him to the property. Thus, it is at best unclear whether Breanna intended to facilitate the murder, and whether she actually aided, promoted, encouraged or instigated the Samuel's killing.[12] Finally, Breanna's alleged actions and statements after the murder, such as helping clean up the murder scene, laughing while saying "this is kinda fun" while cutting bloody upholstery out of the R.V., or lying to police, do not necessarily show she acted as an accomplice to murder. (*Horton, supra*, 11 Cal.4th at p. 1114 [a mere accessory is not an accomplice].)[13]

---

[12] Although Breanna testified Ayala punched a fist into her other hand while stating " ' "He'll get his threesome," ' " she believed Ayala was just going to beat Samuel up and scare him so he would leave her alone. This evidence does not indisputably show Breanna was defendants' accomplice as a matter of law.

[13] Defense counsel's contention during argument to the court outside the jury's presence—that Breanna's status as a coconspirator was synonymous with her being an accomplice—is of no moment because defendants do not contend Breanna is liable for the murder as a principal on a conspiracy theory. Moreover, the jury was not instructed that Breanna was a coconspirator, only that Ayala, Ramirez and Angel were members of the conspiracy.

In sum, no evidence clearly and indisputably showed that Breanna was an accomplice as a matter of law. Accordingly, the court properly refused to instruct that Breanna was an accomplice as a matter of law and correctly allowed the jury to decide whether Breanna had the intent necessary to establish accomplice status. Should the prosecution retry this matter and Breanna testifies, the court should instruct with CALCRIM No. 334.

## DISPOSITION

The judgments are reversed and the matter is remanded to the trial court.


DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


KELETY, J.


29